**WORLD INSURANCE COMPANY, Individually and as Successor–in–Interest to Security General Life Insurance Company,**

v.

**Ralph BRANCH.**

**No. 1:96–cv–2286–RCF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

May 22, 1997.

H. Sanders Carter, Jr., Kenton Jones Coppage, Carter & Ansley, Atlanta, GA, for plaintiff.

Milton Dale Rowan, Koval & Rowan, Atlanta, GA, for defendant.

### ORDER

RICHARD C. FREEMAN, Senior District Judge.

This action is before the court on defendant's motion for partial summary judgment [# 6–1]. The motion is opposed.

### A. Background

In the fall of 1993, while he was living in Austin, Texas, defendant Ralph Branch applied for and purchased a health insurance policy from Security General Life Insurance Company [Security General]. On his application for insurance, defendant represented that he had not been diagnosed as having Acquired Immune Deficiency Syndrome (AIDS) or as being HIV positive. In early

1995, defendant moved to Atlanta, Georgia, retaining his insurance with Security General. Later that year, Security General notified defendant that plaintiff World Insurance Company had fully assumed Security General's obligations. Thereafter, plaintiff learned that defendant had been diagnosed as HIV positive approximately eight years prior to applying for health insurance from Security General. Plaintiff then instituted this action, seeking rescission of the insurance contract on the basis that defendant had fraudulently misrepresented his HIV status in his application for insurance. Defendant counterclaimed, seeking, in part, specific performance of the contract and contesting the validity of a provision in the policy that limited coverage for AIDS treatment to a maximum lifetime benefit of $5,000.

## B. Discussion

Defendant argues that he is entitled to summary judgment on plaintiff's claim for rescission and on his counterclaim for specific performance because plaintiff is barred from raising allegations of fraud. Defendant also argues that he is entitled to summary judgment on his counterclaim that the "AIDS cap" contained in the insurance policy is invalid because it violates Title III of the Americans With Disabilities Act [ADA], 42 U.S.C. § 12181, *et seq.*

### 1. Summary Judgment Standard

Under Fed.R.Civ.P. 56, the court should grant a motion for summary judgment where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The movant carries his or her burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). If the movant satisfies this burden, then the burden shifts "to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). The court, resolving all reasonable doubts in favor of the nonmovant, must determine "whether a fair-

minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

### 2. Rescission/Specific Performance

■ In November 1993, Security General issued a policy of health insurance to defendant, who was then residing in Texas. The policy provides, in relevant part:

> TIME LIMIT ON CERTAIN DEFENSES: After 2 years from the covered person's effective date, no misstatement made in the application, except fraudulent misstatements, will be used to void the policy or deny a claim for loss incurred commencing after the end of the 2 year period.

Pl.'s Exh. 3 at 12. Under Texas law, this provision must be contained in any accident or sickness policy delivered or issued for delivery to any person in Texas. Tex.Ins. Code Ann. art. 3.70–3(A)(2). In Georgia, where defendant now resides, the law requires that a similar provision be included in all accident and sickness policies delivered or issued for delivery in Georgia. *See* O.C.G.A. § 33–29–3. The Georgia statute, however, differs significantly from the Texas statute in that it does not except fraudulent misstatements from its two-year time limitation. *Id.* Defendant, while denying that he misrepresented his HIV status in his application for insurance, seeks to have the Georgia statute govern this litigation.

In arguing extensively about choice of law principles, the parties have unduly complicated the court's analysis. While they seem to agree that Georgia's choice of law rules provide that "a contract is governed as to its nature, validity and interpretation by the law of the state where the contract was made unless it appears from the contract itself that the contract was to be performed in another state," *Sanders v. Doe,* 831 F.Supp. 886, 890 (S.D.Ga.1993) (citing *General Telephone Co. of the Southeast v. Trimm,* 252 Ga. 95, 311 S.E.2d 460 (1984)), they appear to misunderstand the impact of this rule on their dispute. Regardless of whether Texas or Georgia substantive law governs the terms of the contract, defendant cannot overcome the ob-

stacle created by the contract's clear and unambiguous terms; namely, that plaintiff may seek to void the policy on the basis of fraud. Defendant expressly agreed to these terms when he executed the contract on November 15, 1993.

Nonetheless, the Georgia statute would apply if a new contract—one that was to be governed by Georgia law—was created as a result of defendant's move to Atlanta in January 1995. Along these lines, defendant urges the court to follow the holding of *Phillips v. South Carolina Ins. Co.*, 607 F.Supp. 593 (M.D.Ga.1985), a case involving automobile insurance. The *Phillips* court found that an offer of novation occurred when the insured moved to Georgia and that the offer was subsequently accepted when the insurer retained the premium payments sent to it from the insured's new address. This ruling, however, was based on the fact that "a change of state residence is . . . a fundamental change in a contract of automobile insurance." 607 F.Supp. at 595. The court does not find, and defendant has provided it with no authority for finding, that a similar fundamental change occurred to his health insurance policy when he relocated to Georgia. Moreover, under O.C.G.A. § 13–4–4,[1] a novation occurs "[w]here parties, in the course of the execution of a contract, depart from its terms and pay or receive money under such departure." Although defendant asserts that the contract's place of performance became Georgia when he moved there, he does not explain how this conduct resulted in a departure from the terms of the contract. Defendant's insurance policy expressly contemplated that the policy holder might change residences and did not specify a place

of performance. Pl.'s Exh. 3 at 11.[2] Accordingly, a new contract was not created upon defendant's relocation to Georgia, and the original contract remained in effect.

Defendant, under the auspices of a conflict of laws analysis, also advances the theory that the Georgia legislature, through the enactment of O.C.G.A. § 33–29–3, has expressed a public policy that precludes the enforcement of the contractual provision regarding time limits. Although it is true that Georgia chose not to "explicitly except fraudulent misrepresentations from the applicability of [its] incontestability clause," *Blue Cross & Blue Shield of Georgia, Inc. v. Sheehan*, 215 Ga.App. 228, 450 S.E.2d 228, 229 (1994), it is also true that Georgia chose to apply its law only to insurance policies delivered or issued for delivery in Georgia. O.C.G.A. § 33–29–3(a). The policy at issue here was not delivered in Georgia, and thus defendant's public policy argument fails.[3]

Finally, defendant argues that O.C.G.A. § 33–29–3 operates as a statute of limitations, and thus, under the rule of *lex fori* must be applied to the case at bar.[4] Assuming, however, that § 33–29–3 is a statute of limitations, it, by its terms, applies only to insurance policies delivered or issued for delivery in Georgia. As explained above, defendant's insurance policy was issued and delivered in Texas. Accordingly, this Georgia "statute of limitations" does not apply to it.

For the above-stated reasons, the court finds that O.C.G.A. § 33–29–3 does not govern this action. Accordingly, defendant's motion for summary judgment, as it pertains

---

1. Defendant does not argue, and the court does not believe, that O.C.G.A. § 13–4–5, which also involves novation, is availing.

2. As Georgia courts have recognized, "insurance contracts often have no particular place where performance is contemplated." *Batson–Cook Co. v. Aetna Ins. Co.*, 200 Ga.App. 571, 409 S.E.2d 41, 42 (1991). Thus, under a traditional conflicts of law analysis, the law of the place where the insurance contract was made generally applies. *Id.*

3. The court also notes that the Georgia legislature has listed the types of contracts that contravene its public policy and that none of those

include a contract such as the one at bar. *See* O.C.G.A. § 13–8–2. Furthermore, "the provisions of § 13–8–2 . . . should not be enlarged without convincing and conclusive reasons." *Duncan v. Integon General Ins. Corp.*, 267 Ga. 646, 482 S.E.2d 325, 329 (1997) (internal quotation omitted).

4. The familiar rule of *lex fori* provides that procedural or remedial questions, such as those regarding statutes of limitations, are governed by the law of the state in which the action is brought. *Gray v. Armstrong*, 222 Ga.App. 392, 474 S.E.2d 280, 281 (1996).

to plaintiff's claim for rescission and his counterclaim for specific performance, is denied.

### 3. Validity of the AIDS Cap

■ Defendant's insurance policy contains the provision that "Acquired Immunodeficiency Syndrome (AIDS) ... will be covered not to exceed a maximum lifetime benefit of $5,000." Pl.'s Exh. 3 at 7. Defendant contends that this provision is invalid because it violates Title III of the ADA.

Title III of the ADA provides, in relevant part, that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). In the insurance context, however, liability under the ADA is limited by a safe-harbor provision, which provides that Title III "shall not be construed to prohibit or restrict ... an insurer ... from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law." *Id.* at § 12201(c)(1). The safe-harbor provision, however, cannot be used as "a subterfuge" to evade the purposes of Title III. *Id.* at § 12201(c).

Very few courts have had the opportunity to discuss the scope of Title III within the insurance context, and the court has not found any cases that address the issue presented here; namely, whether an insurer who limits health care benefits for AIDS-related treatment to a specific amount has engaged in disability-based discrimination in violation of Title III.[5] There are, however, three threshold issues that can be disposed of summarily. First, it is clear that, as an individual with AIDS, defendant is disabled under the ADA. *See Gonzales v. Garner Food Services, Inc.,* 89 F.3d 1523, 1526 (11th Cir.1996), *petition for cert. filed,* 65 U.S.L.W. 3649 (U.S. Mar. 12, 1997) (No. 96–1478). Second, as an insurer whose operations affect commerce, plaintiff is a place of public accommodation. *See* 42 U.S.C. § 12181(7)(F).

Third, Title III's scope extends beyond the mere denial of physical access to places of public accommodation. *See Carparts Distribution Center v. Automotive Wholesaler's Ass'n of New England, Inc.,* 37 F.3d 12, 19 (1st Cir.1994) (holding that places of public accommodation are not limited to actual physical structures); *Kotev v. First Colony Life Ins. Co.,* 927 F.Supp. 1316, 1321 (C.D.Cal.1996) (same); *Baker v. Hartford Life Ins. Co.,* 1995 WL 573430, *3 (N.D.Ill. Sept.28, 1995) (same); *but see Pappas v. Bethesda Hosp. Ass'n,* 861 F.Supp. 616, 620 (S.D.Ohio 1994). As to these three points, the parties, in essence, agree. The parties part ways, however, with respect to whether the AIDS cap in defendant's insurance policy is discriminatory.

The answer to this question, which boils down to a determination of whether Title III extends to the substance of an insurance company's practices, cannot be discerned from the plain language of the statute. As the First Circuit has noted, "one could spend time arguing about whether [Title III] is intended merely to provide access to whatever product or service the subject entity may offer, or is intended in addition to shape and control which products and services may be offered." *Carparts,* 37 F.3d at 20. Although the *Carparts* court declined to decide the issue, a few district courts have addressed related issues.

In *Anderson v. Gus Mayer Boston Store of Delaware,* 924 F.Supp. 763 (E.D.Tex.1996), the court interpreted § 12201(c) as explicitly allowing insurers to draw some disability-based distinctions—that is, classifications affecting a particular disability—within insurance policies. 924 F.Supp. at 779. The court stated, however, that "it may be possible to provide certain coverage exclusions to individuals with disabilities if the risks of those disabilities so warrant and those risks are treated like other similar risks not associated with disabilities." *Id.* at 780 (emphasis added). Finally, the court found that the ADA "puts the burden on those actors classifying

---

5. A panel of the Sixth Circuit discussed an analogous issue in great length in *Parker v. Metropolitan Life Ins. Co.,* 99 F.3d 181 (6th Cir.1996). That opinion, however, has been vacated for a rehearing en banc. 107 F.3d 359 (6th Cir.1997).

risks to show both their rationality and their permissibility." *Id.* at 779.

Similarly, the court in *Baker v. Hartford Life Ins. Co.*, 1995 WL 573430 (N.D.Ill. Sept.28, 1995), noted that, based on § 12201(c), an insurer may decide not to insure an individual without violating the ADA *if* "the decision not to insure ... constituted underwriting or classifying risks." 1995 WL 573430 at *4. As noted by the *Baker* court, the converse of this statement is that an individual who is disabled may be entitled to recovery under the ADA if the decision to deny that individual coverage "was not based on considerations of underwriting or classifying risks." *Id.*

Finally, in *Doukas v. Metropolitan Life Ins. Co.*, 950 F.Supp. 422 (D.N.H.1996), the court, after reviewing the ADA's legislative history, held that "while insurers retain the ability to follow practices consistent with insurance risk classification accepted under state law, these methods must still be based on sound actuarial principles or related to actual or reasonably anticipated experience." 950 F.Supp. at 432. The court thus denied a motion for summary judgment because of conflicting evidence with regard to whether the insurer's decision to deny coverage was reasonably based on the relative risk posed by the applicant's disability. *Id.* at 430.

The principle to be drawn from these cases appears to be that insurance practices are protected to the extent they are in accord with sound actuarial principles, reasonably anticipated experience, or bona fide risk classification. This principle is consistent with the legislative history of the ADA. For example, one House Report explains that:

> [The safe-harbor provision] is intended to afford to insurers ... the same opportunities they would enjoy in the absence of this legislation to design and administer insurance products and benefit plans in a manner that is consistent with basic principles of insurance risk classification. This legislation assures that decisions concerning the insurance of persons with disabilities which are not based on bona fide risk classification be made in conformity with non-discrimination requirements.
>
> * * * * * *

The provisions recognize that benefit plans (whether insured or not) need to be able to continue business practices in the way they underwrite, classify, and administer risks, so long as they carry out those functions in accordance with accepted principles of insurance risk classification.

> * * * * * *

> [The safe-harbor provision] makes it clear that insurers may continue to sell to and underwrite individuals applying for life, health, or other insurance on an individually underwritten basis, or to service such products, so long as the standards used are based on sound actuarial data and not on speculation.

> * * * * * *

> In sum, [the ADA] requires that underwriting and classification of risks be based on sound actuarial principles or be related to actual or reasonably anticipated experience.

H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 137–38 and pt. 3, at 70 (1990), *reprinted in* 1990 U.S.C.C.A.N. at 303, 445. In addition, the court notes that the purpose of Title III is "to extend [the Rehabilitation Act's] general prohibitions of discrimination [against persons with disabilities] to privately operated public accommodations and to bring individuals with disabilities into the economic and social mainstream of American life." *Id.*, pt. 2, at 99, *reprinted in* 1990 U.S.C.C.A.N. 303. Because access to adequate health care is often integral to a disabled individual's ability to participate in society, the court cannot imagine that an insurer could arbitrarily cap the benefits payable with respect to a particular disability without running afoul of this stated purpose.

Believing that the principle enunciated in the above-referenced cases comports with the statutory language of the ADA, its legislative history, and its purposes, the court adopts it for application to this case. Thus, plaintiff's decision to limit the maximum benefit for AIDS-related treatment does not violate Title III of the ADA if that decision was based on sound actuarial principles, reason-

ably anticipated experience, or bona fide risk classification.[6]

In the case at bar, there is no evidence explaining the purpose for which plaintiff caps an insured's lifetime benefits for AIDS at $5,000. Although plaintiff states that its policy was approved by the Texas Insurance Commissioner prior to it being issued to any of its insureds, it does not explain the purpose for which the policy was submitted or whether the AIDS cap was approved as being consistent with state law risk classifications. In addition, the court notes, as a matter of logic, that the underwriting risks associated with the treatment of AIDS cannot be so different from the treatment of innumerable other disabilities, which, with the exception of transplant and replacement procedures, are capped under the policy at $2,000,000. Because there is a complete absence of evidence demonstrating that plaintiff's decision to cap its coverage of AIDS was based on sound actuarial principles, reasonably anticipated experience, or bona fide risk classification, the court grants defendant's motion for summary judgment as it relates to his counterclaim under Title III of the ADA.

## C. Conclusion

Accordingly, defendant's motion for partial summary judgment [# 6–1] is GRANTED in part and DENIED in part as set forth in the body of this Order.

---

6. Of course, "an insurance practice that is otherwise not inconsistent with state law may still be a 'subterfuge' to evade the purposes of the ADA and therefore unprotected by the safe-harbor provision." *Doukas,* 950 F.Supp. at 432. *See also Baker,* 1995 WL 573430 at *4 ("[E]ven though an insurer may claim to be basing a

denial of coverage on actuarial or classification of risk considerations, that claim is not conclusive as the question of whether section 12201(c)(1) is being used as a subterfuge would remain."). Defendant, however, has not argued that plaintiff's cap on the benefits for AIDS was a subterfuge to avoid the purposes of the ADA.